Vicki L. **SLUITER**, Plaintiff,

v.

**BLUE CROSS AND BLUE SHIELD OF MICHIGAN**, Defendant.

No. 97–73609.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 1, 1997.

Elizabeth Gleicher, Detroit, MI for Plaintiff.

Michael Vartanian, Detroit, MI, for Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

EDMUNDS, District Judge.

This matter comes before the Court on motions for preliminary injunctions in two separate cases, *Vicki L. Sluiter v. Blue Cross and Blue Shield of Michigan,* (No. 97–73609), and *Eva Navarro v. Blue Cross and Blue Shield of Michigan,* (Case No. 97–40286. Hon. Paul V. Gadola). Due to the similarities in the cases, this Court combined them for evidentiary hearings and oral argument on July 29 and 30, 1997. For the reasons that will be detailed below, this Court hereby grants both motions for a preliminary injunction.

### I. Facts

#### A. Breast Cancer

Each of the Plaintiffs has been diagnosed with breast cancer. According to data from the Michigan Department of Public Health, more than 5,000 women in Michigan are diagnosed each year with breast cancer. Ex. 1 to Defendant's Response Briefs. It is the most common form of cancer and second most common form of cancer deaths in women. Approximately 1,500 women died from the disease in 1986.

Breast cancer is classified into four stages based on several factors, including the size of the tumor, how far the disease has spread, and whether the tumors are operable. Stage I cancer is characterized by small tumors within the breast, with no lymph nodes involvement. Patients with stage I breast cancer have a high five year disease free survival rate, as high as eighty percent. Stage II breast cancer involves larger tumors, not to exceed 5 cm, and may include maligning of the lymph nodes. The five year disease free survival rate for stage II breast cancer varies from 40 to 80 percent depending on the size of the tumor and the number of nodes involved. A patient is classified as having stage III breast cancer if the tumor is more than five centimeters in size. A patient is diagnosed as having stage IV breast cancer once the cancer has spread outside of the

breast. The survival rates for stage IV patients is low. Before the development of high dose chemotherapy, stage IV "essentially resulted in the death of all patients who had that stage and extent of the disease." (Dr. Peters).

Both of the Plaintiffs have stage III breast cancer. There are two sub-sets of stage III breast cancer. A patient is diagnosed as III–A if the tumor is operable upon initial presentation. A patient is III–B if the tumor is not operable, often due to its attachment to the skin or chest wall. These patients are usually treated with chemotherapy in order to shrink the tumor and make surgery possible. Stage III–B breast cancer is the most rare form, and it affects less than five percent of all patients. Typically, Stage III–B breast cancer is found in younger women, and it is described as an "inflammatory" breast cancer because of the unusually aggressive tumors. Survival rates for stage III–A breast cancer patients are slightly lower than for stage II patients, and the same factors affect the chances of recovery. The two main factors are the size of the tumor and the number of lymph nodes involved. Patients with III–B breast cancer have a four to forty percent chance of five-year disease-free survival.

One possible course of treatment for breast cancer patients is high dose chemotherapy. As the name suggests, extremely high dosages of cancer fighting drugs are given to the patient. At these high dosages, however, the drugs are also toxic to other portions of the patient's body, including the bone marrow. For this reason, this treatment is always combined with a form of bone marrow replacement. Some physicians perform "autologous bone marrow transplantation." In this process, healthy bone marrow is collected from the patient before chemotherapy by inserting needles into the patient's hip. The bone marrow cells are frozen until after the chemotherapy, at which point they are returned to the patient's body. A second bone marrow harvesting procedure, peripheral stem cell rescue, has come into more widespread use in recent years. In this procedure, bone marrow cells are taken directly out of the blood of the patient. While this may not yield as many bone marrow stem cells, the procedure is less painful and invasive, and the cells are more "mature" than those taken from the hip.

The use of high dose chemotherapy has increased rapidly for breast cancer patients in recent years. Several thousand patients receive the treatment each year. In fact, it is the most common reason for performing a bone marrow transplant. The Defendant has acknowledged that it is no longer an experimental or investigational course of treatment for stage IV breast cancer patients and has paid for the procedure since March of 1996. Increasingly over the last ten years, doctors have also been treating stage II and III patients with high dose chemotherapy.

## B. Eva Navarro

Eva Navarro is a 45 year old woman with Stage III–B breast cancer, diagnosed in February of 1997. Initially, she was placed in neo-adjuvant chemotherapy in order to shrink the tumor and allow surgery. She responded to this treatment and then had a mastectomy. Following the surgery, Ms. Navarro was referred to Harper Hospital, where she was evaluated by the oncology and transplantation groups at the Karmanos Cancer Institute. At this time, Ms. Navarro had already had a 10 percent reduction in cardiac function as a result of conventional chemotherapy. Additional conventional treatment did not appear to be an appropriate option because of the likely additional impact on cardiac function, which would then disqualify her from receiving high dose chemotherapy with a stem cell rescue. Her treating physician, Dr. Jared Klein, recommended that Ms. Navarro receive high dose chemotherapy because of her high risk of recurrence.

Ms. Navarro is the beneficiary of a certificate of health care coverage issued by the Defendant, Blue Cross and Blue Shield of Michigan. Her physicians contacted Blue Cross in order to obtain pre-authorization for the high dose chemotherapy treatment. On June 4, 1997, Blue Cross denied coverage for this treatment on the grounds that it is "experimental/ investigational". Ms. Navarro's physician appealed this decision, but Blue Cross never responded. She is not currently undergoing any treatment for her cancer and

could likely begin a high dose chemotherapy regimen within a short period of time.

## C. Vicki Sluiter

Vicki Sluiter is a 35 year old woman with Stage III–A breast cancer.[1] She recently had a mastectomy during which her physician removed a tumor approximately the size of a golf ball. Thirteen of eighteen lymph nodes sampled were positive for cancer, and her physicians recommended that Ms. Sluiter undergo high dose chemotherapy.

Ms. Sluiter is a beneficiary of a certificate of health care coverage issued by the Defendant, Blue Cross. Her physicians contacted Blue Cross to obtain pre-authorization for this treatment. Blue Cross denied coverage on June 11, 1997, claiming the treatment was "experimental/investigational in the treatment of this member's breast cancer and excluded as a benefit under the terms of the certificate and relevant riders." After Ms. Sluiter's physician appealed this decision, Blue Cross reasserted its position by letter on June 23. While she is awaiting the outcome of this motion, the Plaintiff is not receiving any treatment. She is currently eligible to begin her prescribed high dose chemotherapy regimen.

## D. History of the Litigation

Both Plaintiffs filed suit on July 3 in Wayne County Circuit Court, where their motions for preliminary injunction were scheduled for July 31. The cases were removed by the Defendant on July 23 because they involve claims for benefits under 29 U.S.C. § 1132(a)(1)(B).[2] Plaintiffs filed their motions for preliminary injunction in this Court on July 28. Each contends that Mich. Comp. Laws Ann. §§ 550.1416 and 550.1416a require Blue Cross to provide coverage for her treatment. Each side has submitted briefs on the legal issues presented in this motion. In addition, the Court heard testimony from expert witnesses during evidentiary hearings held on July 29 and 30.

## II. Burden of Proof for Preliminary Injunction

The availability of injunctive relief is a procedural question that is governed by federal law. *Southern Milk Sales, Inc. v. Martin,* 924 F.2d 98 (6th Cir.1991). The Sixth Circuit has held that a court must consider four factors in deciding whether to issue a preliminary injunction:

1. whether the movant has shown a strong or substantial likelihood of success on the merits;

2. whether the movant has demonstrated irreparable injury;

3. whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. whether the public interest is served by the issuance of an injunction.

*Parker v. United States Dep't of Agric.,* 879 F.2d 1362, 1367 (6th Cir.1989). The foregoing factors should balanced. *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985). Where the three factors other than the likelihood of success all strongly favor issuing the injunction, a district court is within its discretion in issuing a preliminary injunction if the merits present a sufficiently serious question to justify a further investigation. *Id.* at 1230. Alternatively, the court may also issue a preliminary injunction if the movant "at least shows serious questions going to the merits *and* irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1270 (6th Cir.1985) (citations omitted).

Blue Cross argued in its response to the motions for a preliminary injunction that the normal four part standard for issuing a preliminary injunction should be modified where the injunction would effectively award the plaintiffs everything that they would get after a trial on the merits. An injunction

---

1. In her brief, Ms. Sluiter claims to have stage III–B breast cancer. This Court, however, will accept the medical opinion of her treating physician, Dr. Lawrence Pawl, that Ms. Sluiter has stage III–A breast cancer. Pawl Deposition at 13.

2. This section provides:
 A civil action may be brought by a participant or beneficiary ... to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

which changes the status quo, the defendant argues, requires that the four factors weigh "heavily and compellingly" in the plaintiff's favor. A similar result was reached in *Neveux v. Webcraft Techs., Inc.*, 921 F.Supp. 1568, 1571 (E.D.Mich.1996).

Although the Court appreciates that an injunction is more commonly used to maintain the status quo rather than alter it, and that by this injunction the Plaintiffs are actually seeking ultimate relief, there are competing concerns in this case because of the certainty and gravity of the irreparable harm the Plaintiffs face. In *Stenberg v. Cheker Oil Co.*, 573 F.2d 921 (6th Cir.1978), the Sixth Circuit reviewed a preliminary injunction granted by a district court judge. The court found, "[t]he prevention of irreparable harm should outweigh re–establishment of the status quo in fashioning interlocutory relief. . . ." *Id.* at 925. The Sixth Circuit also stated that the maintenance of the status quo was not the foremost purpose in granting an injunction. "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Id.*, quoting *Canal Authority v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974).

Because maintenance of the status quo would threaten Ms. Navarro's and Ms. Sluiter's lives, the normal four-part standard for issuance of a preliminary injunction applies in this case, not the heightened standard adopted in *Neveux.*

### III. Preemption

Defendant argues that the Plaintiffs' claims are preempted by ERISA. ERISA supersedes all state laws that relate to employee benefit plans. 29 U.S.C. § 1144(a); *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (ERISA comprehensively regulates employee pension and welfare plans and expressly and broadly preempts state laws relating to plans governed by ERISA). Employee benefits plans are broadly defined as any plan, fund, or program which was established or maintained by an employer or by an employee organization for the purpose of providing medical and other benefits for its participants through the purchase of insurance or otherwise. 29 U.S.C. § 1002(1).

The Supreme Court recently acknowledged that the "relate to" language of ERISA's preemption clause is "unhelpful." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 646–49, 115 S.Ct. 1671, 1673, 131 L.Ed.2d 695 (1995). However, "ERISA's preemption provision is clearly expansive." *California Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.,* —— U.S. ——, ——, 117 S.Ct. 832, 837, 136 L.Ed.2d 791 (1997). To determine if a law is preempted by ERISA, the Supreme Court looks at two factors: "A law relates to a covered employee benefit plan for purposes of § 514(a) if it (1) has a connection with or (2) reference to such a plan." *Id.* (citations omitted).

If a law relates to ERISA, it may still be saved from preemption by virtue of the insurance savings clause, 29 U.S.C. § 1144(b)(2)(A). State laws regulating insurance are not preempted for underwritten plans like those in this case. In evaluating whether or not a particular law falls into the business of insurance, courts must evaluate the law to see if "common sense" dictates that it regulates insurance. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50, 107 S.Ct. 1549, 1554, 95 L.Ed.2d 39 (1987). Courts must also evaluate the law under three criteria, derived from the McCarran–Ferguson Act, 15 U.S.C. § 1011: (1) whether the practice has the effect of transferring or spreading a policy holder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry. *Id.* at 50–51, 107 S.Ct. at 1554–55; *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 743, 105 S.Ct. 2380, 2391, 85 L.Ed.2d 728 (1985).

Blue Cross argues that the Michigan laws at issue in this case are not saved from preemption because they are contained in the Nonprofit Health Care Corporation Reform Act ("the Act"), which is not a part of the Michigan Insurance Code. As a result, they claim that the statutes do not "regulate insurance" and are preempted because they relates to an ERISA plan. Blue Cross also

argues that they are not an insurance company because the Michigan Legislature does not regulate them in such a way. The Act provides that "[a] health care corporation shall not be subject to the laws of this state with respect to insurance corporations, except as provided in this act." Mich. Comp. Laws Ann. § 550.1201. Blue Cross notes that Michigan courts have traditionally treated it differently from other health insurance companies. *Blue Cross v. Insurance Comm'r*, 403 Mich. 399, 417, 270 N.W.2d 845 (1978) ("It is not an insurance company in the usual sense of the term."); *Michigan Hospital Service [Blue Cross] v. Sharpe*, 339 Mich. 357, 370–71, 63 N.W.2d 638 (1954) (finding that Blue Cross could not use subrogation portions of the Michigan Insurance laws because Blue Cross's contracts were not ones of insurance); *City of Roseville v. AFL–CIO*, 53 Mich.App. 547, 557, 220 N.W.2d 147 (1974) (noting that Blue Cross was found in *Sharpe* not to be an insurance company.)

This Court disagrees with Blue Cross's position and finds that §§ 550.1416 and 550.1416a are not preempted by ERISA because even if they relate to an ERISA plan, they would be saved by virtue of the insurance savings clause. *Foster v. Blue Cross and Blue Shield of Michigan*, 969 F.Supp. 1020 (E.D.Mich.1997). The sections have too tenuous a relation to an ERISA plan to merit preemption. "A law relates to a covered employee benefit plan for purposes of § 514(a) if it (1) has a connection with or (2) reference to such a plan." *California Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.*, —— U.S. ——, ——, 117 S.Ct. 832, 837, 136 L.Ed.2d 791 (1997) (citations omitted). These sections do not make direct reference to welfare benefit plans, and therefore are not preempted under the second prong of the *Dillingham* test.

However, since many employee welfare benefit plans choose to use Blue Cross in their plans, the law has some connection to ERISA plans. To determine if this connection is forbidden under the first prong of the *Dillingham* test, courts must look at "the objectives of the ERISA statute as a guide to the scope of the state law the Congress understood would survive" and "the nature of the effect of the state law on ERISA plans." *Dillingham*, —— U.S. at ——, 117 S.Ct. at

838; *Travelers*, 514 U.S. at 655–57, 115 S.Ct. at 1677.

The purpose of ERISA is:

> to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government ..., [and to prevent] the potential for conflict in substantive law ... requiring the tailoring of plans and employer conduct to the peculiarities of each jurisdiction.

*Travelers*, 514 U.S. at 656–57, 115 S.Ct. at 1677 (quoting *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 142, 111 S.Ct. 478, 484–85, 112 L.Ed.2d 474 (1990)).

In *Travelers*, the Court evaluated a New York law that imposed surcharges on hospital rates for patients not enrolled in a Blue Cross plan. The law also imposed surcharges on certain Health Maintenance Organizations. However, the Supreme Court held that these charges were not preempted by ERISA. The Court held:

> An indirect economic influence, however, does not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself;.... Nor does the indirect influence of the surcharges preclude uniform administrative practice or the provision of a uniform interstate benefit package if a plan wishes to provide one. It simply bears on the costs of benefits and the relative costs of competing insurance to provide them. It is an influence that can affect a plan's shopping decisions, but it does not affect the fact that any plan will shop for the best deal it can get, surcharges or no surcharges.

*Travelers*, 514 U.S. at 659–60, 115 S.Ct. at 1679.

■ Based on the Supreme Court's holding in *Travelers*, it appears that §§ 550.1416 and 1416a of the Act do not "relate to" an ERISA plan, and therefore, are not preempted by it. While the Act unquestionably has an indirect economic influence on those plans choosing to use Blue Cross for their coverage, the law itself does not regulate those

plans or impose a different administrative regimen upon them. It regulates Blue Cross, a company that some plans choose to hire to assist in the operation of their plans. The plans are still free to select another insurer for their coverage or to self-insure, in which case the requirements of those provisions would not apply. The operation, administration, and requirements for plans are still mandated by ERISA. Sections 550.1416 and 1416a do not affect any plan's requirements under ERISA. Following Blue Cross's argument to its logical conclusion would lead to a finding that Michigan is not allowed to impose any regulations at all upon Blue Cross. Therefore, the Court finds that §§ 550.1416 and 1416a are not preempted because they do not relate to an ERISA plan.

■ Even if these sections did relate to an ERISA plan, they would be saved from preemption because they are state laws regulating insurance under the McCarran–Ferguson criteria. They spread the risk of payment for antineoplastic treatment over a large group of people. Spreading the risk of payment for a high cost treatment over a large group of people is an integral part of the relationship between Blue Cross and all of its subscribers. Finally, these sections only apply to those entities covered by the Act.

Case law strongly supports the finding that §§ 550.1416 and 550.1416a are saved from preemption. In *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728, (1985), the Supreme Court found that a state law mandating that minimum levels of mental health benefits be included in state insurance policies was not preempted. "[I]t is both historically and conceptually inaccurate to assert that mandated-benefit laws are not traditional insurance laws." *Id.* at 742, 105 S.Ct. at 2390. The Sixth Circuit held in *Michigan United Food & Commercial Workers Unions v. Baerwaldt,* 767 F.2d 308 (6th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 801, 88 L.Ed.2d 777 (1986), that a Michigan statute requiring insurance companies to provide minimum levels of substance abuse treatment was saved from ERISA preemption. Mandated benefits laws such as sections 1416 and 1416a fall within the scope of ERISA's savings clause, and therefore, are not preempted.

■ Blue Cross claims that the Nonprofit Health Care Corporation Act does not regulate them as an insurance company. That is not the case. The Act states that Blue Cross is not regulated as an insurance company "except as provided in this act." All of the Michigan laws involved in this case actually are in the Act, 1980 Mich. Pub. Acts No. 350, that is the exact same Act that the Defendant tries to use to avoid being regulated as an insurance company. Sections 1416 and 1416a were added to the Act in 1989 Mich. Pub. Acts No. 57, fall under the ERISA savings clause, 29 U.S.C. § 1144(b)(2)(A), and are not preempted.

## IV. Private Right of Action

■ Blue Cross claims in its response brief that Plaintiffs may not bring a direct cause of action against it. Instead, it argues that their remedy is limited to an injunctive or declaratory action against the Michigan Insurance Bureau. Mich. Comp. Laws Ann. § 550.1619(3) provides that "[A]ny person may bring an action in the circuit court for Ingham county for declaratory and equitable relief against the commissioner or to compel the commissioner to enforce this act or rules promulgated under this act."

As the Defendants noted in their notice of removal, Plaintiffs' cause of action is really one to recover benefits allegedly due to them under their plans. This Court finds that this is an ERISA cause of action under 29 U.S.C. § 1132(a)(1)(b) and the Plaintiffs have a private cause of action.

## V. Standard of Review

One of the difficult questions in this case is what standard this court must use to evaluate the decision of the Blue Cross administrator. If a benefit plan gives an administrator or fiduciary complete discretionary authority to determine eligibility, then this Court may only review his or her decision for an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). However, the denial of benefits is normally reviewed de novo, where there is no discretionary power given to the fiduciary. *Firestone.*

■ The plans involved in these cases do give Blue Cross discretion to determine what is "experimental or investigational." However, because the Court finds that these cases turn on a question of interpretation of Michigan's Nonprofit Health Care Corporation Reform Act, a de novo review of Blue Cross's decision is appropriate. Although the plans give Blue Cross discretion to determine what constitutes an experimental or investigational treatment, that determination is not the key question in this case. Rather, this court must determine if the provisions of Mich. Comp. Laws Ann. §§ 550.1416 and 550.1416a have been met. If they have, then coverage for these courses of treatment must be provided. Blue Cross can not reserve discretion to avoid the requirements of the Michigan statute. Section 550.1416a provides that if all of the conditions are met, "coverage shall be provided." Section 550.1416 provides that coverage meeting the definition of "breast cancer rehabilitative services" and "breast cancer outpatient services" must be included in all certificates.

"When an eligibility determination by plan administrators turns on a question of law, courts have not hesitated to apply a de novo standard of review." *Gauer v. Connors*, 953 F.2d 97 (4th Cir.1991). The statute in *Gauer* was ERISA, not a state law. However, the standard remains the same for any court engaged in an interpretation of law. A court reviews questions of law under a de novo standard. The Second Circuit reached a similar conclusion in *Weil v. Retirement Plan Administrative Committee*, 913 F.2d 1045, 1048 (2d Cir.1990), *aff'd in part and vacated in part on other grounds*, 933 F.2d 106 (2d Cir.1991). The administrator's decision in *Weil* depended on an interpretation of the Internal Revenue Code. The Second Circuit held that a decision to deny benefits that involved a question of legal interpretation was not entitled to any deference. Even though it was undisputed that the Plan gave the administrator discretionary authority to determine eligibility for benefits, the Second Circuit held that the district court properly applied the de novo standard of review because the ultimate issue turned on a question of law. Because the Plaintiffs' eligibility for benefits turns on an interpretation on Mich. Comp. Laws Ann. §§ 550.1416 and 550.1416a, this Court will apply a de novo standard of review to the administrator's decision.

## VI. Evidence That This Court May Consider

■ Defendant argues that this Court's review of its denial of benefits is limited to the same evidence that was submitted to the plan administrator when he made his determination. *See, e.g. Perry v. Simplicity Engineering*, 900 F.2d 963, 966 (6th Cir.1990) ("Nothing in the legislative history suggests that Congress intended that federal district courts would function as substitute plan administrators, a role they would inevitably assume if they received and considered evidence not presented to administrators....")

Because these matters involve a question of law under the Michigan statute, Defendant's position is not well-founded. As a preliminary matter, even under the rule urged by Blue Cross, the Court's limitation would still include evidence that was *available* to the insurance company at the time of its decision. *See McMahan v. New England Mutual Life Ins. Co.*, 888 F.2d 426, 431 n. 1 (6th Cir.1989). Data published in medical journals or made available to Blue Cross before the time that the administrator denied coverage was "available" to Blue Cross. Whether the administrator chose not to consider the information, was unaware of the information, or refused to research to find the information is immaterial. The information contained in those reports was *available*, and therefore, this Court may properly consider it.

Furthermore, since this Court is determining whether the provisions of Mich. Comp. Laws Ann. §§ 550.1416 and 1416a have been met, the court finds that it may consider evidence that the administrator did not. The issues in this case are complicated, and in order to make a fully informed decision on the merits, this Court must consider all available medical evidence and have that evidence explained with the aid of expert testimony. Oncology is a rapidly changing and rapidly developing field. In order to determine what types of treatment are safe, effective, substantiated in the medical literature, and generally accepted by oncological organizations,

this Court is obligated to consider the testimony of expert witnesses from both Plaintiffs and Defendant.

## VII. The Merits

### A. Plaintiffs Have Shown Likelihood of Success on the Merits

#### 1. Section 550.1416

 This Court finds that the Plaintiffs have shown a likelihood of success on the merits under Mich. Comp. Laws Ann. § 550.1416. This section provides:

(1) Subject to dollar limits, deductibles, and co-insurance provisions that are not less favorable than those for physical illness generally, a health care corporation shall offer or include, in each group and non-group certificate, coverage for breast cancer diagnostic services, breast cancer outpatient treatment services, and breast cancer rehabilitative services.

\* \* \* \* \* \*

(3) As used in this section:

(b) "Breast cancer rehabilitative services" means a procedure intended to improve the result of, or ameliorate the debilitating consequences of, treatment of breast cancer, delivered on an inpatient or outpatient basis, including but not limited to, reconstructive plastic surgery, physical therapy, and psychological and social support services.

(d) "Breast cancer outpatient treatment services" means a procedure intended to treat cancer of the human breast, delivered on an outpatient basis, including but not limited to surgery, radiation therapy, chemotherapy, hormonal therapy, and related medical follow-up services.

The high dose chemotherapy regiment prescribed for Ms. Navarro by the physicians at the Karmanos Institute and for Ms. Sluiter by her treating oncologist qualify as both a breast cancer rehabilitative service and a breast cancer outpatient treatment service. Accordingly, Blue Cross is required to offer coverage for them. The Court bases its decision on the testimony of Dr. William Peters, the President and Chief Executive Officer of the Karmanos Cancer Institute in Detroit, Dr. Roy Baynes, a hematologic oncologist with Harper Hospital, and Dr. Lawrence Pawl, an oncologist from Grand Rapids. Dr. Peters is one of the country's most well-respected oncologists. He has published over 150 articles on breast cancer, researched extensively in the area of high dose chemotherapy treatments for breast cancer, developed a clinical trial for high dose chemotherapy breast cancer treatment, and treated thousands of patients with breast cancer. Dr. Baynes is a consulting oncologist at Harper Hospital with extensive experience in the treatment of breast cancer, and Dr. Pawl is Plaintiff Sluiter's treating oncologist.

All of these physicians testified that the treatment prescribed for the Plaintiffs is intended to improve the result of, or ameliorate the consequences of stage III breast cancer. Dr. Peters testified that high dose chemotherapy with peripheral stem cell harvesting is utilized in the treatment of thousands of patients every year in the United States. The procedure increases the long-term disease-free five year survival rate dramatically, from as low as 4 percent under conventional dosage chemotherapy, to as high as 70 percent. Data submitted in Plaintiff's exhibit 4, which appeared in the Journal of Clinical Oncology, compares two different types of high dose chemotherapy treatments. The results demonstrate that after several years, patients who have received higher doses of chemotherapy with peripheral stem cell rescue have a significantly higher chance of long-term cancer-free survival. In fact, none of the patients in the lower dose arm of the comparison study remained cancer free after eight years. Over half of the patients treated with the high dose chemotherapy with bone marrow transplantation remained cancer free after eight years. It is clear that the proposed course of treatment is "intended to improve the result of, or ameliorate the debilitating consequences of, treatment of breast cancer," and therefore, this Court finds that the Plaintiffs have shown a likelihood of success on the merits under § 550.1416(b).

Defendant argues that Plaintiffs and this Court have misconstrued the legislative intent of Mich. Comp. Laws Ann. § 550.1416. This Court rejects this argument for two

reasons. First, a court will not examine legislative intent where the plain language of a statute is clear and unambiguous. "There is ... no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *United States v. American Trucking Ass'ns, Inc.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). The plain language of this statute is that a health care corporation "shall offer or include, in each group and nongroup certificate, coverage for breast cancer outpatient treatment services [and] breast cancer rehabilitative services." Mich. Comp. Laws Ann. § 550.1416. Those two terms, which were defined earlier, are broadly defined. This Court finds that the plain language of the statute includes coverage for the Plaintiffs' treatments.

Even after examining the legislative history, this Court finds that the Plaintiffs' are covered by § 550.1416. In a section of the legislative report on this section, the Michigan Legislature summarized the arguments for and against the bill. In the "against" section, the following argument is noted:

> The insurance industry generally resists mandatory coverage proposals, which increase the cost of coverage to everyone. Sometimes small increases in insurance costs can be the difference between being able to afford some insurance or none. Some people, regrettably, must choose lower-cost, less comprehensive insurance coverage, and the industry argues that mandated coverages will eliminate that option.

Ex. 1 to Defendant's Response. Defendant argues that this is evidence that the legislature did not intend for this section to provide mandatory coverage. This Court disagrees for several reasons. First, the section quoted above is listed in the "against" section. The legislature voted for the bill, and therefore, they showed that they felt the concerns voiced in that argument were not significant. In addition, other portions of that report indicate that the legislature was aware of and approved of this mandatory benefits law. "The bills [§§ 1416 and 1416a] also contain a provision that would require insurance coverage for certain drugs used in treatment of cancer that are not always covered now."

*Id.* Moreover, the report states, "[i]f more women have insurance coverage for screening (and *any* necessary treatment and rehabilitative services), more women will undergo screening. There will be more early detection and treatment, and lives will be saved." *Id.* The legislative history indicates that the Michigan Legislature was aware that this bill would provide mandatory health care benefits if certain prerequisites were met. Because the prerequisites have been met in these cases, this Court finds that the statute mandates coverage.

## ·2. Section 550.1416a

██ Plaintiffs have also shown a likelihood of success on the merits under section 550.1416a. Section 550.1416a of the Act provides that coverage for antineoplastic therapy shall be provided if the following criteria are met:

(a) The drug is ordered by a physician for the treatment of a specific type of neoplasm.

(b) The drug is approved by the federal food and drug administration for use in antineoplastic therapy.

(c) The drug is used as part of an antineoplastic drug regimen.

(d) Current medical literature substantiates its efficacy and recognized oncology organizations generally accept its treatment.

(e) The physician has obtained informed consent from the patient for the treatment regimen which includes federal food and drug administration approved drugs for off-label indications.

There is no dispute regarding (a), (b), (c), and (e). Drs. Peters, Baynes, and Pawl testified that the drugs prescribed for these patients are being ordered by a physician in order to treat a specific neoplasm. The drugs have all been approved by the Food and Drug Administration for use in antineoplastic therapy. The drugs are all used as part of an antineoplastic drug regimen. Further, the physicians testified that it was their regular practice to receive informed consent from their patients before beginning any chemotherapy treatment.

**1142**

The only dispute in these matters involves subsection (d). Therefore, this Court must determine whether the current medical literature substantiates the efficacy of high dose chemotherapy and whether it is generally accepted by recognized oncology organizations. After reviewing all of the depositions, testimony, exhibits, and arguments presented by both parties, this Court finds that recognized oncology organizations generally accept high dose chemotherapy and that the medical literature substantiates its efficacy.

For example, the National Cancer Institute funds three regional groups that work together to determine the value of different courses of treatments. These "recognized oncology organizations" are the East Coast Oncology Group (ECOG), Southwest Oncology Group (SWOG), and the Cancer and Leukemia Group B (CALGB). All of these organizations generally accept and utilize treatment with high dose chemotherapy for patients who have stage III breast cancer. Since January of 1991, the groups have participated in phase III randomized clinical trials of high dose chemotherapy with bone marrow replacement for stage II & III breast cancer. These trials were started after high dose chemotherapy showed promise for treating patients with other cancers, with stage IV breast cancer, and with a more limited number of patients with stage II and III breast cancers. Dr. Peters testified that it would be unethical for the oncology organizations to offer the treatment in a randomized clinical trial unless high dose chemotherapy was generally recognized and accepted as being at least as safe and effective as conventional treatment.

Dr. Peters also testified that he is the principal investigator in a clinical trial that is comparing the effectiveness of two different high dose chemotherapy regimens. The first arm of the study receives "CPB" high dose chemotherapy with peripheral stem cell rescue, and the other receives the highest possible dose that can be administered without stem cell rescue. While Dr. Peters' test does not include patients with Stage III–B breast cancer, he testified that the results would be useful to the study of Stage III–B breast cancer. Stage III–B patients were not included because III–B is a rare form of breast cancer. According to Dr. Peters, stage III–

B generally behaves like Stage IV breast cancer, and therefore, results from other clinical trials are relevant. This is particularly important because high dose chemotherapy with stem cell rescue has been acknowledged even by Blue Cross to be a recognized, safe, and effective treatment for stage IV breast cancer; indeed, it is a covered benefit. Dr. Peters testified that data presented to Blue Cross with Ms. Navarro's case history included information showing the effectiveness of high dose chemotherapy in the treatment of both stage III–B and stage IV breast cancer, conditions which have many common behavioral characteristics.

Dr. Peters summarized data from articles published in current medical literature. One recent article, Karen H. Antman, *High–Dose Chemotherapy with Autologous Hematopoietic Stem–Cell Support for Breast Cancer in North America,* 15 J. of Clinical Oncology No. 5 (May 1997), analyzes data from over 19,000 patients registered with the Autologous Bone Marrow Registry of North America between 1989 and 1995. Of these, over 5,000 had breast cancer. In this period, the number of patients treated with high dose chemotherapy increased substantially. Further, the 100 day mortality rate decreased substantially—from 20% in 1989 to 5% in 1995. The article concluded that the three year disease-free survival rate in women treated with high dose chemotherapy is high. Patients with stage II breast cancer had a 65 percent survival rate, and those with stage III had a 60 percent rate. Even stage IV patients had good results with high dose chemotherapy, with disease-free survival rates ranging from 7 to 32 percent, depending on how they responded to conventional treatment. Antman also stated that in the last ten years, treatment related mortality rates had fallen from 22 to 5 percent.

Other medical literature also substantiates the efficacy of high dose chemotherapy treatment in breast cancer. *See* Peters, *High-dose Chemotherapy with Autologous Bone Marrow Transplantation for the Treatment of Breast Cancer: Yes, in* Important Advances in Oncology (DeVitta, et al., eds.1995). This article reviews data from a study done

at Duke University. This study established that over 60% of the 662 patients treated with high-dose therapy for primary breast cancer remained disease free after five years. (Fig.15–5). Although Dr. Peters acknowledges that the long-term effects of high dose chemotherapy are not yet known and the completion of ongoing randomized clinical trials is desirable, his data demonstrate that high dose chemotherapy is efficacious in the treatment of breast cancer. The results reported in Dr. Peters' article are confirmed by data from other institutions throughout the world. (*Id.* at 223). In another article in the Journal of Clinical Oncology, Dr. Peters summarized data from approximately 100 women treated with standard-dose adjuvant chemotherapy followed by a high-dose regimen with bone marrow transplantation. 11 J. of Clinical Oncology No. 6 (June 1993). He concluded that the treatment resulted in a decreased frequency of relapse in patients with high risk primary breast cancer. This article was co-authored by twenty other oncologists, such as Roy Jones, Elizabeth Shpall, and Maureen Ross.

There was also ample testimony regarding the efficacy of the specific treatment protocols recommended for each Plaintiff. Dr. Baynes testified that without the high dose chemotherapy treatment, Ms. Navarro has a four to twenty percent chance of long-term survival. By way of comparison, he estimated that with high dose chemotherapy, Ms. Navarro has at least a 50 percent chance to remain cancer free for five years. While there was no testimony specifying survival rates for Ms. Sluiter's proposed course of treatment, this Court will accept Dr. Peters' testimony regarding high dose chemotherapy in general as evidence of the efficacy of the proposed course of treatment. Dr. Peters testified that patients with Stage III–B breast cancer have long-term disease-free survival rates that vary from 4% to 40%, but that the chances of long-term survival would increase with high dose chemotherapy. In addition, Dr. Pawl testified that due to the high number of lymph nodes involved, high dose chemotherapy was Ms. Sluiter's best option for survival.

After reviewing the articles described above and the other articles the Plaintiffs submitted in Ex. G to their motion for a preliminary injunction, this Court is persuaded that Plaintiffs are likely to prevail on the merits. Plaintiffs have submitted considerable medical evidence that was available to Blue Cross showing that high dose chemotherapy with peripheral stem cell rescue is generally accepted by oncology organizations and that its efficacy is substantiated in the medical literature. The treatments each Plaintiff is scheduled to receive have been approved as part of a research trial at the treating hospital. Because this court finds that all five criteria of § 550.1416a have been met, it appears that Ms. Navarro has a strong likelihood of succeeding on the merits of her case.

The main thrust of the Defendant's argument is that the treatment proposed for the Plaintiffs is still experimental or investigational in nature, and therefore, it is not obligated to provide coverage for it. Defendant's expert witness, Dr. Seymour Adelson, testified that Blue Cross considered the implications of Michigan's mandated benefits law when it adopted its policies on coverage for high dose chemotherapy, and that those policies are in accordance with the law. This Court disagrees. Whether the treatment is experimental or investigational is not the issue. Those words never appear in the language of § 550.1416a and are secondary in importance. Those terms are taken from the Riders to the Blue Cross policy. Where state law mandates that coverage be provided, contradictory policy provisions are invalid. Blue Cross cannot use language from a policy Rider to avoid the effect of a mandated benefit law.

Defendant's witness Dr. Seymour Adelson testified that because there have been no phase III randomized clinical trials completed comparing the effectiveness of high dose chemotherapy regimens with conventional chemotherapy regimens, Blue Cross has determined as a matter of policy that there is insufficient evidence to establish that high dose chemotherapy is as safe and as effective as conventional chemotherapy. This conclusion is not supported, however, by either the medical literature or the testimony of physicians most knowledgeable in the field. In this regard, Dr. Adelson's testimony regard-

ing high dose chemotherapy was not as persuasive as Dr. Peters'. Dr. Adelson is an employee of Blue Cross. During his active practice, he specialized in internal medicine, allergies, and immunology. He never specialized or even practiced in the field of oncology. Given Dr. Adelson's lack of experience in this area, his testimony was not as persuasive as that of Dr. Peters.

Even if "experimental and investigational" were the proper standard, this Court would find that Defendant's argument is unpersuasive. The inability to complete phase III trials does not demonstrate that high dose chemotherapy is an unproven form of treatment. Dr. Peters testified that it has been difficult to complete such trials because patients and physicians are unwilling to choose conventional therapy over high dose therapy given the severe limitations of conventional therapy with advanced or aggressive cancers, and the significant increase in disease-free survival when such cancers are treated with high dose chemotherapy (as showing in the phase II studies previously discussed). Where a course of treatment appears to be substantially superior to another, it is difficult to proceed with randomized trials; this is particularly true where the conventional treatment has been unsuccessful historically, and the disease is virtually always fatal given such treatment.

The Defendant has provided coverage for other high dose chemotherapy treatments where there were no completed phase III randomized trials. Dr. Adelson conceded that Blue Cross covers high dose chemotherapy treatment for testicular cancer, despite the fact that no phase III trials were completed. Moreover, Defendant's focus on the absence of completed phase III clinical trials in these circumstances has diverted their attention from the medical literature which substantiates its efficacy and the recognition and utilization of high dose chemotherapy by oncology organizations. Other courts faced with this issue have found that an insurer may not deny coverage due to the lack of phase III trials where there is other evidence to demonstrate that the treatment is effective. *See, e.g., Wilson v. CHAMPUS,* 65 F.3d 361, 365–66 (4th Cir.1995) (finding that insurer abused its discretion in denying coverage for high-dose chemotherapy for stage II breast cancer patient). Like the defendant in *Wilson,* this Court finds that the Defendant in these matters has "overemphasiz[ed] the necessity of Phase III clinical trials" and "ignored abundant evidence that HDC/PSCR is gaining widespread acceptance in the medical community." *Id.* at 366.

Blue Cross also submitted some medical literature in support of its position. The data and discussion in many of these articles, however, further support this Court's conclusion that the efficacy of high dose chemotherapy is supported by the medical literature. For example, in William J. Gradishar, *High–Dose Chemotherapy for Breast Cancer,* at 599, the author states that "[h]igh-dose chemotherapy followed by transplantation of autologous bone marrow or peripheral blood stem cells ... has emerged as a common strategy for treating breast cancer." Although Dr. Gradishar's article is written to encourage physicians to complete phase III trials before concluding that high dose chemotherapy is superior to conventional therapy, this Court is not asked to determine which course of treatment is *most* effective. The statute requires Blue Cross to provide coverage if the efficacy of the antineoplastic treatment is supported by current medical literature. The medical literature submitted by Blue Cross does substantiate the efficacy of high dose chemotherapy treatment. Another article, by J.F. Tomas in *Bone Marrow Transplantation* (1997), at 334, summarizes the results of a small study of breast cancer patients treated with a high-dose regimen after a standard-dose adjuvant regimen. The author found that, "[i]n our experience, CTCb after standard-adjuvant therapy is a relatively well tolerated and safe HDT regimen for women with high-risk breast cancer."

Most of the articles submitted by the Defendant take the position that randomized clinical trials are necessary before the long-term effects of high dose chemotherapy can be fully understood and evaluated. Plaintiffs' experts do not disagree. As previously noted, the fact that several authors recommend studying high dose chemotherapy in phase III trials is consistent with this Court's finding that current medical literature sup-

ports the efficacy of the treatment. If there was not substantial evidence that the treatment is safe and effective, no ethical physician could recommend that his patient participate in such a study.

### 3. Plaintiffs Have Demonstrated Irreparable Injury

Each Plaintiff's chances of long-term survival without high dose chemotherapy treatment is small. Dr. Peters testified that patients with Stage III–B breast cancer have long-term disease-free survival rates that vary from 4% to 40%. Dr. Baynes testified that without the high dose chemotherapy treatment, Ms. Navarro has a four to twenty percent chance of long-term survival. By way of comparison, both doctors estimated that with high dose chemotherapy, Ms. Navarro has at least a 50 percent chance to remain cancer free for five years. While Dr. Pawl could not state a specific survival rate, he did testify that given the aggressive nature of Ms. Sluiter's cancer, high dose chemotherapy was, in his opinion, her best chance for long-term cancer-free survival.

Further, this Court finds that without this injunction, it is unlikely that either Plaintiff would be able to undergo the high dose chemotherapy treatment. Ms. Sluiter's affidavit demonstrates financial need. She and her husband have few liquid assets, and the cost of treatment is at least $60,000. Ms. Navarro, while not as financially needy as Ms. Sluiter, still does not have the financial resources to pay for this treatment herself. This Court finds that each Plaintiff will suffer irreparable harm without this preliminary injunction because she will be unable to receive the course of treatment recommended by her physician.

### 4. Substantial Harm to Others

Blue Cross will not suffer substantial harm because of these preliminary injunctions. Although the treatments will cost it a considerable amount of money, this is a financial issue that may be redressed if this Court is ultimately proven to be wrong.

### 5. The Public Interest

The Court finds that the public interest is best served by enforcing the laws of the State of Michigan. The Plaintiffs have established that those laws require the Defendant to provide them with treatment.

### 6. Security

Fed.R.Civ.P. 65(c) provides that no preliminary injunction shall issue except upon the giving of security in a sum that the Court deems proper to compensate for the payment of costs and damages suffered by the Defendant if it is wrongfully enjoined. Due to the strong likelihood of Plaintiffs' success on the merits and their demonstrated financial inability, the Court finds it would be improper to require any security in this matter. *See Roth v. Bank of the Commonwealth,* 583 F.2d 527, 539 (6th Cir.1978) (district court has discretion to require no bond be posted for preliminary injunction); *Schalk v. Teledyne, Inc.,* 751 F.Supp. 1261 (E.D.Mich.1990) (same).

### 7. Scope of Coverage

At oral argument, Defendant raised an issue regarding whether this Court could order it to pay Response Oncology for Ms. Sluiter's treatment. Blue Cross asserts that Response Oncology is not a "provider" under the terms of the Nonprofit Health Care Corporation Act and Blue Cross's policies. Issues concerning payment terms and amounts for providers or non-participating providers are a matter of contract between the parties and are not impacted by this opinion.

## VIII. Conclusion

For the reasons stated above, this Court finds that Plaintiffs' motions for a preliminary injunction are **GRANTED**. Defendant Blue Cross and Blue Shield of Michigan is hereby **ORDERED** to provide coverage for the high dose chemotherapy with peripheral stem cell rescue prescribed for each of the Plaintiffs.

**SO ORDERED.**